UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**CARL RICHARD SIVEC,**

       **Plaintiff,**               **CIVIL ACTION NO. 13-cv-15008**

       **v.**                        **DISTRICT JUDGE PATRICK J. DUGGAN**

**COMMISSIONER OF**         **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

       **Defendant.**
_____/

REPORT AND RECOMMENDATION

Plaintiff Carl Richard Sivec seeks judicial review of Defendant Commissioner of Social Security's determination that he is not entitled to social security benefits for his physical and mental impairments under 42 U.S.C. §§ 405(g) and 1383(c)(3).  (Docket no. 1.)  Before the Court are Plaintiff's Motion for Summary Judgment (docket no. 13) and Defendant's Motion for Summary Judgment (docket no. 18).  The motions have been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  (Docket no. 4.)  The undersigned has reviewed the pleadings, dispenses with a hearing pursuant to Eastern District of Michigan Local Rule 7.1(f)(2), and issues this Report and Recommendation.

I.       **RECOMMENDATION**

For the reasons stated herein, Plaintiff's Motion for Summary Judgment (docket no. 13) should be DENIED, and Defendant's Motion for Summary Judgment (docket no. 18) should be GRANTED.

## II.     PROCEDURAL HISTORY

Plaintiff filed an application for supplemental security income with a protective filing date of January 30, 2009, alleging disability beginning December 25, 2008, due to seizure disorder and depression. (*See* TR 29, 268.) The Social Security Administration denied Plaintiff's claims on July 15, 2009, and Plaintiff requested a *de novo* hearing. (TR 29.) The ALJ adjourned Plaintiff's first hearing, scheduled for October 24, 2011, for the claimant to attend a psychological consultative examination. (TR 29.) A second hearing was scheduled for March 28, 2012, at which Plaintiff appeared with counsel and testified before Administrative Law Judge (ALJ) Michael R. Dunn. (TR 29, 90.) This hearing was suspended because Plaintiff had a medical emergency; the hearing was continued on June 15, 2012. (TR 29.) In a July 23, 2012 decision, the ALJ found that Plaintiff was not entitled to benefits because he was capable of performing a significant number of jobs in the national economy. (TR 29-41.) The Appeals Council declined to review the ALJ's decision (TR 1-6), and Plaintiff commenced this action for judicial review. The parties then filed cross motions for summary judgment, which are currently before the Court.

## III.    HEARING TESTIMONY AND MEDICAL EVIDENCE

### A.     Plaintiff's Testimony

Plaintiff was 53 years old at the time of the administrative hearings and 50 years old on the date the application was filed. (TR 39, 105.) Plaintiff testified that he was currently living with his significant other, Isabel Jordan, in her house. (TR 104-05.) Plaintiff stated that his marital status was single, he had three estranged adult children, and he did not have a current source of income. (TR 105-06.) Plaintiff advised that he was about six feet tall and usually weighed about 200 pounds, but that he currently weighed approximately 220 pounds; Plaintiff attributed his weight gain to medication side effects. (TR 105.) Plaintiff told the ALJ that he had a driver's license, but he didn't

2

drive because his doctor advised that it would be dangerous. (TR 106.) Plaintiff elaborated that he stopped driving about two and a half years prior to the hearing. (TR 106.) Plaintiff testified that he had a high school education, was able to read and write, and had specialized training as a carpenter. (TR 107.) Plaintiff said that he didn't serve in the Armed Forces because of his flat feet and epilepsy. (TR 107.)

Plaintiff testified that he had not worked since the alleged onset of disability in December 2008. (TR 107.) Plaintiff stated that he wasn't exactly sure when he last worked, but believed that it was right before his disability started, possibly in October of 2008. (TR 107-08.) Plaintiff explained that he had done a lot of different subcontract work as a carpenter, which included installing drywall. (TR 108.) Plaintiff admitted that his past work involved some pretty heavy lifting, sometimes over 50 pounds. (TR 108.) Plaintiff testified that he stopped doing that work because of the seizures. (TR 108.) Plaintiff explained that he never knew when the seizures were going to happen and admitted to being afraid to have a seizure on the job site. (TR 109.)

Plaintiff then confirmed that, in terms of physical limitations, the primary reason why he could not work was the seizures. (TR 110.) Plaintiff explained that the seizures cause confusion and shakiness in his arms and legs and that the petite mal seizures cause him to space out and limit his concentration. (TR 110.) Plaintiff added that his medication makes him very tired. (TR 110.) Plaintiff then told the ALJ that his depression was still a problem. (TR 111.) Plaintiff testified that he saw a psychiatrist regarding his depression on a regular basis three or four times per year, who would prescribe medications for Plaintiff. (TR 111-12.) Plaintiff admitted that other than the medications or therapy that took place when he saw the psychiatrist, the psychiatrist was not doing anything else for Plaintiff in terms of treating his depression due to finances. (TR 112.) Plaintiff also testified to seeing another doctor on a regular basis every couple of months who would monitor

Plaintiff's blood levels and prescribe his seizure medication. (TR 112-13.) Plaintiff stated that he was taking Depakote at 1875 milligrams for his seizures and Zoloft at 100 milligrams for his depression. (TR 114.) Plaintiff said that the dosage of the Depakote was increased a couple of months prior to the hearing. (TR 114.) He said that after the increase in dosage, he was a little more confused, the seizures were a bit less severe, but he hadn't noticed a change in their frequency. (TR 115.)

Plaintiff testified that the Zoloft has reduced the extreme crashing and extreme suicidal thoughts related to his depression, but averred that he was still having problems with depression. (TR 115-16.) He said that the depression affected the way he felt about life in general; he said that there were days where he felt like "everything suck[ed]," and he'd rather "just check out." (TR 116.) Plaintiff further described his depression as "no joy," "worse on cloudy days," and a little better on sunny days. (TR 117.) Plaintiff said that as far as interest in life, "you do what you can or try to find something you can get interested in so you don't decide to go over." (TR 117.) Plaintiff testified that he always made an attempt to get out of bed and to function in some way so that he wasn't always spiraling downhill. (TR 118.)

Plaintiff told the ALJ that he generally had difficulty getting along with people and that he'd rather be alone than be around people. (TR 118.) He elaborated that he wouldn't be able to ride the bus because it's too close quartered. (TR 118.) Plaintiff added that he would get "a large anxiety" around people he didn't know. (TR 119.) Plaintiff testified that he did not have any sleep problems and that he was able to bathe, dress, and feed himself. (TR 119.) Plaintiff stated that he did not go grocery shopping. (TR 119.) He further stated that he did not have any hobbies or attend church or any social organizations. (TR 119.)

Plaintiff testified that he had two different kinds of seizures; for purposes of the hearing

4

Plaintiff and the ALJ categorized them as big seizures and little seizures. (TR 120.) Plaintiff described the big seizures as the kind that shook his entire body and would cause him to almost lose consciousness. (TR 120-21.) He said that he had lost consciousness once or twice when the seizures were particularly severe. (TR 121.) Plaintiff testified that the big seizures happened at least once per month and that he would typically bite his mouth, tongue, or lips when they occurred. (TR 121.) Plaintiff admitted that he did not always go to the hospital when he had a big seizure because he didn't have the money. (TR 121.) He added that a lot of times he would go lay down and sleep for one and a half to two hours after a seizure. (TR 122.) When asked to describe his little seizures, Plaintiff explained that there were ones where he would black out for 30 seconds at a time without knowing that he did so and others where his limbs would shake. (TR 122.) He added that sometimes it was just the arms and sometimes it was just the legs. (TR 122.) Plaintiff then said that he thought his arm was starting to shake. (TR 122.) Plaintiff told the ALJ that the little seizures that involved shaking of the limbs happened once or twice a week and the ones in which he blacked out could happen two or three times per day. (TR 123, 124.) Plaintiff admitted that the last time he went to the hospital was in 2008. (TR 123.) The ALJ then adjourned the hearing, as Plaintiff was having a medical emergency. (TR 129.)

At the continuation of the hearing, Plaintiff testified that he was going to have an EEG and an MRI performed after the hearing as recommended by one of his doctors. (TR 55.) Plaintiff also stated that he had last seen his psychiatrist three or four months prior and that it was probably time for him to go see him again. (TR 58.) Plaintiff told the ALJ that he did not consume alcohol or use illegal drugs. (TR 59-60.) Plaintiff also confirmed that he has no income and no insurance, that even if his significant other had insurance, it wouldn't cover him, and that his significant other had no legal responsibility to pay for Plaintiff's medical care. (TR 63.)

Plaintiff testified that after the previous hearing, he went to the car and laid down. (TR 64-65.) He said that he then went to the doctor's office and told them that he had a seizure in court, but the doctor was unavailable, so he went home and slept for a couple of hours. (TR 65.) Plaintiff explained that the small seizures affect his ability to function in that he is foggy, cloudy, sleepy, his arms and legs get extremely weak, and his whole body gets fatigued. (TR 66.) Plaintiff elaborated that it could take him anywhere from four minutes to five hours to recover from such a seizure, which usually occurred twice a week at various times of the day. (TR 66-67.) Plaintiff also stated that his seizure medication made him tired, sleepy, and really scattered. (TR 70.) He added that the seizures had been less frequent as a result of the medication, but his doctor wanted to prescribe additional medication. (TR 71.)

      **B.**      **Witness Testimony**

Isabel Jordan, Plaintiff's significant other of 25 years, also testified at the hearing. Ms. Jordan testified that when she was at work, she would call Plaintiff every two hours to make sure that he was taking his medicine. (TR 74.) She added that she would cook him dinner, which he would reheat in the microwave. (TR 74.) Ms. Jordan further added that there have been a couple times that she has asked a friend to check in on Plaintiff while she was at work because Plaintiff was having problems. (TR 74-75.) Ms. Jordan stated that Plaintiff's doctor has prohibited him from driving because his partial seizures may turn into a grand mal seizure. (TR 75.)

Ms. Jordan testified that she witnesses Plaintiff's seizures most of the time, which occur at least three to four times per week. (TR 75.) Ms. Jordan explained that she didn't know that much about the petite mal seizure previously, but since her and Plaintiff have had to "go through this because [her] income significantly dropped," they've been trying to document the seizures more as advised by Plaintiff's counsel. (TR 75.) Ms. Jordan elaborated that she and Plaintiff had been

reading more about the signs of a seizure and that Plaintiff has been having at least one to two petite mal seizures per day and partial seizures with shaking at least three to four times per week. (TR 75-76.) Ms. Jordan told the ALJ that the frequency of Plaintiff's seizures has changed over the last couple of years and that it is not improving with medication. (TR 76.) She said that it seems like when his doctors increase the medication, it works for a little while, but once Plaintiff's body gets used to the medication, the seizures start coming more frequently. (TR 76.)

Ms. Jordan explained that when Plaintiff had certain seizures, his arm and leg would shake. (TR 77.) With other seizures, she explained that Plaintiff's leg would shake and sometimes go to sleep and that his eyes would twitch. (TR 77.) When Plaintiff had petite mal seizures, Ms. Jordan explained that Plaintiff would have a blank stare. (TR 77.) She said that when her and Plaintiff first got together, she thought that was just how he was. (TR 77.) But she said that the more she learned about epilepsy, the more she learned to recognize the signs of a seizure. (TR 77.) Ms. Jordan testified that at the time of the hearing, Plaintiff was having petite mal seizures at least once a day, sometimes one to two times daily. (TR 77.) Ms. Jordan elaborated that she witnessed Plaintiff have a seizure once a day, but she explained that he could have been having seizures while she was at work without either she or Plaintiff realizing it. (TR 77-78.)

### C. Vocational Expert's Testimony

First, the Vocational Expert (VE) classified Plaintiff's past work as a carpenter as skilled at the medium exertional level, performed up to the heavy exertional level. (TR 81.) The VE advised that Plaintiff's past work would not provide for the acquisition of skills that would transfer to less exertional activity because it was job specific. (TR 81.)

Next, the ALJ asked the VE whether a hypothetical person of the same age, education, work experience, and acquired skill set as Plaintiff who was capable of performing up to medium

exertional activity, lifting and carrying as much as 50 pounds occasionally and as much as 25 pounds frequently, and sitting for eight hours, standing for eight hours, and walking for eight hours, but who could not climb ladders or scaffolds, should never be exposed to unprotected heights, must avoid hazardous machinery, and never operate a motor vehicle could perform Plaintiff's past work.  (TR 82.)  The VE testified that such an individual would not be able to perform Plaintiff's past work, but he could perform unskilled work at the medium exertional level such as a sorter, for which there were 2,000 jobs available in southeast Michigan and 90,000 available in the national economy; a cleaner, for which there were 5,000 jobs available in southeast Michigan and 200,000 available in the national economy; and a packer, for which there were 3,000 jobs available in southeast Michigan and 150,000 available in the national economy.  (TR 82-83.)

The ALJ then asked the VE whether there would be jobs existing in significant numbers that a second hypothetical person could perform, assuming all of the conditions of the first hypothetical, where, because of side effects from medications and seizures, that person had a significant impairment in concentration, persistence, and pace, such that the work would need to be limited to simple, routine, and repetitive unskilled tasks performed at SVP one or two as defined in the Dictionary of Occupational Titles, free of fast-paced production requirements with few, if any, workplace changes, and should not require anything more than simple, work-related decisions, and where that person would be limited to no more than occasional interaction with supervisors and coworkers, no tandem tasks, and no interaction with the general public.  (TR 83-84.)  The VE responded that such an individual would be able to perform the jobs she listed in response to the first hypothetical question.  (TR 84.)

For the third hypothetical question, the ALJ asked the VE whether any jobs existing in significant numbers would be available to that same hypothetical individual if the exertional level

8

was reduced to light exertional activity. (TR 84.) The VE testified that at the light exertional level, there would be unskilled positions available to the hypothetical individual such as a sorter, for which there were 4,000 jobs available in southeast Michigan and 220,000 available in the national economy; an inspector checker, for which there were 6,000 jobs available in southeast Michigan and 240,000 available in the national economy; and a small products assembler, for which there were 5,000 jobs available in southeast Michigan, and 240,000 available in the national economy. (TR 84.)

Next, the ALJ asked the VE to assume that the hypothetical person was going to have frequent, unscheduled breaks in addition to the regularly scheduled breaks and that there would be periods of time in which he would have difficulty staying on task due to medication side effects or residuals of seizures, such that it was reasonable to assume that he would be off task 20 percent of the day. (TR 84-85.) The ALJ asked the VE whether this limitation would in and of itself preclude competitive employment. (TR 85.) The VE responded in the affirmative. (TR 85.) Lastly, the ALJ asked the VE whether competitive employment would be precluded if the hypothetical person was going to miss three days or more of work per month on a consistent, sustained basis. (TR 85.) The VE responded that competitive employment would be precluded. (TR 85.)

### D. Medical Record

Plaintiff (docket no. 13 at 5-8), Defendant (docket no. 18 at 4-9), and the ALJ (TR 34-38) each set out a factual background related to Plaintiff's medical record. There are no significant inconsistencies between the three accounts; thus, the Court will incorporate them by reference herein. The undersigned has, however, conducted an independent review of Plaintiff's medical record and will include comments and citations as necessary throughout this Report and Recommendation.

### IV. ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of January 30, 2009, and that Plaintiff suffered from the following severe impairments: seizure disorder and affective disorder. (TR 31.) The ALJ also found, however, that Plaintiff's impairments did not meet or medically equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (TR 31-33.) The ALJ then found that Plaintiff had the following residual functional capacity (RFC):

> [C]laimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except the claimant can never climb ladders or scaffolds. He must avoid unprotected heights, hazardous machinery, and no operation of motor vehicles. The claimant would require simple, routine, and repetitive unskilled tasks performed at an SVP of 1 or 2 as defined in the DOT, free of fast paced production requirements with few, if any, work place changes. The claimant could only have simple work related decisions required. He could have occasional interaction with supervisors and co-workers with no tandem tasks and no interaction with the public.

(TR 33-39.) Subsequently, in reliance on the VE's testimony, the ALJ determined that Plaintiff was capable of performing a significant number of jobs in the national economy. (TR 39-40.) Therefore, the ALJ found that Plaintiff was not disabled under the Social Security Act at any time since January 30, 2009, the date Plaintiff's application was filed. (TR 40.)

### V. LAW AND ANALYSIS

#### A. Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it

is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### B. Framework for Social Security Determinations

Plaintiff's Social Security disability determination was made in accordance with a five-step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1) Plaintiff was not presently engaged in substantial gainful employment; and

(2) Plaintiff suffered from a severe impairment; and

(3) the impairment met or was medically equal to a "listed impairment;" or

(4) Plaintiff did not have the residual functional capacity (RFC) to perform relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented Plaintiff from doing past work,

the Commissioner, at step five, would consider Plaintiff's RFC, age, education, and past work experience to determine if Plaintiff could perform other work. If not, Plaintiff would be deemed disabled. *See id.* at § 404.1520(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

### C. Analysis

The Social Security Act authorizes "two types of remand: (1) a post judgment remand in conjunction with a decision affirming, modifying, or reversing a decision of the [Commissioner] (a sentence-four remand); and (2) a pre-judgment remand for consideration of new and material evidence that for good cause was not previously presented to the [Commissioner] (a sentence-six remand)." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citing 42 U.S.C. § 405(g)). Under a sentence-four remand, the Court has the authority to "enter upon the pleadings and transcript of the record, a judgment affirming, denying, or reversing the decision of the [Commissioner], with or without remanding the cause for a hearing. 42 U.S.C. § 405(g). Where there is insufficient support for the ALJ's findings, "the appropriate remedy is reversal and a sentence-four remand for further consideration." *Morgan v. Astrue*, 10-207, 2011 WL 2292305, at *8 (E.D.Ky. June 8, 2011) (citing *Faucher*, 17 F.3d at 174).

Plaintiff asserts that this matter should be reversed and remanded under sentence four

because (1) "[t]he ALJ misapplied the Listings applicable to epilepsy" and (2) "[t]he ALJ failed to adequately determine whether [P]laintiff's seizures would preclude him from performing sustained work activity on a regular and continuing basis." (Docket no. 13 at 10-15.)

### *1. Step Three Determination*

A claimant will be deemed presumptively disabled and eligible for benefits if his impairment meets or medically equals one of the listings of impairments at the third step in the disability evaluation process. 20 C.F.R. § 416.920(a)(4)(iii). "When considering presumptive disability at Step Three, an ALJ must analyze the claimant's impairments in relation to the Listed Impairments and give a reasoned explanation of his findings and conclusions in order to facilitate meaningful review." *Christephore v. Comm'r of Soc. Sec.*, No. 11-13547, 2012 WL 2274328, at *6 (E.D. Mich. June 18, 2012) (citing *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x. 411, 416 (6th Cir. 2011)). A claimant must satisfy all of the criteria to meet a listing, or have impairments which are medically equivalent to or equal in severity and duration to the criteria of a listed impairment. *Id.*; *Rabbers v. Comm'r,* 582 F.3d 647, 653 (6th Cir. 2009). It is the claimant's burden to demonstrate that he meets or equals a listed impairment at the third step of the sequential evaluation. *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987).

Plaintiff argues that the ALJ misapplied the listings applicable to epilepsy, 11.02 and 11.03, by indicating that EEG documentation was required, but absent from the record; requiring clinical or objective evidence to support Plaintiff's physician's statements; failing to consider Ms. Jordan's testimony regarding the frequency of Plaintiff's seizures; and failing to analyze the reason for Plaintiff's sub-therapeutic seizure medication levels. (Docket no. 13 at 10-13.)

To meet the criteria for listing 11.02 epilepsy - convulsive epilepsy (grand mal or psychomotor), the claimant must present a documented, detailed description of a typical seizure

pattern, including all associated phenomena, showing that his seizures occur more frequently than once a month in spite of at least 3 months of prescribed treatment. The claimant's seizure pattern must demonstrate either (A) daytime episodes with loss of consciousness and convulsive seizures, or (B) nighttime episodes manifesting residuals which interfere significantly with daytime activity. To meet the criteria for nonconvulsive epilepsy under listing 11.03, a claimant must demonstrate that he has seizures occurring more frequently than once weekly. Under both listings, the criteria will only be applied if the seizure activity persists "despite the fact that the individual is following prescribed antiepileptic treatment." Listing 11.00(A); Soc. Sec. Ruling (SSR) 87-6 (due to widely available modern treatment, only a small percentage of individuals with epilepsy who are under appropriate treatment will be precluded from engaging in substantial gainful activity).

Here, at Step Two of the five-step sequential analysis, the ALJ found that Plaintiff had two severe impairments: seizure disorder and affective disorder. (TR 31.) At Step Three, he found that Plaintiff's seizure disorder did not meet or medically equal the severity of epilepsy under listings 11.02 or 11.03 because the medical evidence did not reveal the requisite frequency of seizures. (TR 32.) The ALJ further cited evidence that Plaintiff had gone one year without a seizure and also had some reported sub-therapeutic levels of Depakote, his seizure medication. (TR 32.) Later in his decision, the ALJ meticulously examined the records of Dr. Nalini Samuel, M.D., the physician who primarily treated Plaintiff's seizure disorder during the relevant period, and reiterated that Dr. Samuel's treatment records did not indicate the frequency of seizures as alleged by Plaintiff and Ms. Jordan. (TR 35.) The ALJ noted that Dr. Samuel's records generally consisted of checkups and medication management and revealed only minimal treatment for his secondary generalized epilepsy disorder. (TR 35.) The ALJ highlighted the fact that on February 11, 2010, Dr. Samuel indicated that Plaintiff had not experienced a seizure in one year, this year being entirely during Plaintiff's

alleged disability period. (TR 35.) The ALJ then discussed Dr. Samuel's July 20, 2010 progress note, in which she indicated that Plaintiff had a seizure on March 20, 2010, and experienced shaking of his arms and legs on June 17, 2010 and his index finger on June 20, 2010. (TR 35 (citing TR 436).) The ALJ pointed out that these three events did not amount to a significant frequency of seizures. (TR 35.) He also emphasized the fact that Plaintiff had been taking generic antiepileptic medication during that period instead of the name-brand Depakote prescribed by Dr. Samuel. (TR 35.) The ALJ noted that despite the seizures and other episodes reported in Dr. Samuel's treatment records, Plaintiff's physical and neurological examinations were normal and that Plaintiff was able to meet his needs in the home. (TR 35.) Furthermore, the ALJ stressed that although Dr. Samuel's more recent progress notes dated May 2011, October 2011, January 2012, and June 2012, documented episodes of partial and possible seizures, those episodes were not reported to be as frequent as alleged at the hearing. (TR 35-36.)

The ALJ also summarized both Plaintiff's and Ms. Jordan's testimony and found it to be less than credible as to the frequency of Plaintiff's seizures due to its inconsistency with the record.[1] (TR 34, 38.) Specifically, the ALJ referenced a Seizure Questionnaire dated June 9, 2009, completed by Ms. Jordan in which she indicated that Plaintiff's last grand mal seizure occurred on December 25, 2008, and that his last partial seizure occurred on February 18, 2009. (TR 35 (citing TR 288-89).) The ALJ found that Ms. Jordan's questionnaire responses did not support her hearing testimony of daily and weekly seizures. (TR 35.) The ALJ also noted that at Plaintiff's October 20, 2011 appointment with Dr. Samuel, Ms. Jordan described Plaintiff's "episodes" as weekly but that in January and June of 2012, Dr. Samuel recorded the frequency of Plaintiff's seizures as "a few"

---

[1]Plaintiff has not challenged the ALJ's determination of Plaintiff's or Ms. Jordan's credibility; therefore, the Court will not address it in this Report and Recommendation.

15

and "some partial seizures," respectively. (TR 36.) Plaintiff's argument that the ALJ failed to take into account Ms. Jordan's testimony regarding the frequency of Plaintiff's seizures fails.

The ALJ also evaluated the medical evidence of Plaintiff's blood levels of his antiepileptic medication, Depakote, and noted that three of the seven blood level readings between March 2009 and October 2011 were sub-therapeutic. (TR 36.) The ALJ stated that Plaintiff's sub-therapeutic blood level readings suggested that Plaintiff was not always compliant with keeping his medication within the therapeutic range. (TR 36.) Plaintiff argues that the ALJ put too much emphasis on Plaintiff's sub-therapeutic blood levels without analyzing why they were not therapeutic. The Social Security Administration (SSA) has provided guidance on this issue:

> Should serum drug levels appear therapeutically inadequate, consideration should be given as to whether this is caused by individual idiosyncrasy in absorption of metabolism of the drug. Blood drug levels should be evaluated in conjunction with all the other evidence to determine the extent of compliance. When the reported blood drug levels are low, therefore, the information obtained from the treating source should include the physician's statement as to why the levels are low and the results of any relevant diagnostic studies concerning the blood levels.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.00(A). Dr. Samuel submitted Plaintiff's aforementioned Depakote blood level results to the SSA in list form without any explanation for the sub-therapeutic levels. (TR 460.) Plaintiff does not explain how the ALJ is supposed to analyze the reasons for Plaintiff's sub-therapeutic blood levels and assign them any more or less weight in his step three determination if the ALJ does not have the evidence necessary to perform such an analysis before him. Generally, it is a claimant's burden to provide a complete record. *See* 20 C.F.R. § 416.912. Plaintiff has not done so here. Thus, Plaintiff's Motion should be denied on this issue.

Next, Plaintiff argues that the ALJ misapplied the epilepsy listings by indicating that EEG documentation was required but absent from the record and by requiring "clinical or objective evidence" to support Dr. Samuel's statements. (Docket no. 13 at 10.) In making these two

arguments, Plaintiff cites to a portion of the ALJ's decision in which he discusses two forms completed on October 19, 2011 by Dr. Samuel. (TR 36.) In these forms, Dr. Samuel opined by placing a checkmark next to "yes" that Plaintiff had major and minor motor seizures, documented by EEG and by detailed description of a typical seizure pattern, occurring more frequently than once a month (major seizures) and once weekly (minor seizures) in spite of at least three months of prescribed treatment. (TR 430-31.) In response to Dr. Samuel's form opinion, the ALJ stated:

> However, Dr. Samuel failed to provide any support in the form of clinical or objective evidence to support her statements. Moreover, listings for both major and minor seizures required documentation by an EEG, which is not in the file. As such, although Dr. Samuel is the claimant's long time treating neurologist, her conclusory and unsupported statements located in Exhibit 11F are rejected.

(TR 36.) When viewed in full context, it is clear that the ALJ's references to the lack of EEG documentation and clinical or objective evidence were made as reasons for rejecting Dr. Samuel's October 19, 2011 statements and were not determinative of the ALJ's finding that Plaintiff's seizure disorder did not meet or medically equal the epilepsy impairments under listing 11.02 or 11.03.

For the foregoing reasons, the undersigned finds that the ALJ did not misapply listings 11.02 or 11.03 to this matter. The ALJ's Step Three determination is supported by substantial evidence in the record; remand or reversal on this issue is not warranted.

### 2. *The ALJ's Compliance With Social Security Ruling 96-8p*

In assessing residual functional capacity, "the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *7 (Jul. 2, 1996). Plaintiff contends that the ALJ failed to comply with SSR 96-8p's requirement by failing to adequately determine whether Plaintiff's seizure disorder would preclude Plaintiff's ability to perform sustained work activities on a regular and continuing basis. (Docket no. 13 at 13-15.) Here, after a thorough discussion of the hearing

testimony and Plaintiff's seizure-related medical record, the ALJ discussed his determination of Plaintiff's physical RFC:

> In considering the above medical evidence, in combination with the claimant's testimony at the hearings and the other evidence of record, the undersigned finds the claimant's seizure disorder would not restrict him beyond the limited range of medium work identified. Physical examinations were consistently unremarkable and there is no objective or clinical evidence to support a more restrictive exertional level than medium. Further the record contains no EEG. Restrictions f[ro]m the claimant's seizure disorder as identified by Dr. Samuel have been accounted for in the RFC by limiting the claimant to no climbing of ladders or scaffolds, no operation of motor vehicles, and avoidance of unprotected heights and hazardous machinery.

(TR 36.)

Plaintiff argues that the ALJ's attempt to deal with the impact of Plaintiff's seizure disorder by restricting him from climbing ladders or scaffolds, operating motor vehicles, and being around unprotected heights and hazardous machinery is inadequate. (Docket no. 13 at 13.) Plaintiff seemingly suggests that additional limitations, such as the unexpected need to take unscheduled breaks, leave work, or miss work altogether when suffering a seizure are inherent characteristics of epilepsy and should have been included in Plaintiff's RFC. (*Id*. at 13-14.) Plaintiff does not cite to any authority to support his position, nor does he point to any medical opinions or other evidence in the record to demonstrate that those limitations are actually warranted. Thus, Plaintiff's argument fails.

The ALJ considered the evidence of record and crafted an RFC that accurately portrays Plaintiff's credible limitations. Then, during the hearing, the ALJ presented appropriate hypothetical questions to the VE and specifically asked the VE whether an individual with Plaintiff's specific limitations would be able to perform work on a regular sustained and competitive basis. (TR 83-84). The VE testified that competitive work would be available for an individual with the identified limitations. (TR 84.) The undersigned concludes that the ALJ complied with the requirements of

SSR 96-8p.

## VI. CONCLUSION

For the reasons stated herein, the undersigned recommends that Plaintiff's Motion for Summary Judgment (docket no. 13) be DENIED and that Defendant's Motion for Summary Judgment (docket no. 18) be GRANTED.

### REVIEW OF REPORT AND RECOMMENDATION

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: January 23, 2015      s/ Mona K. Majzoub
                             MONA K. MAJZOUB
                             UNITED STATES MAGISTRATE JUDGE

**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: January 23, 2015      s/ Lisa C. Bartlett
                             Case Manager